Good morning, ladies and gentlemen. Our first case for this morning is Vasquez v. Indiana University Health. Ms. O'Connor. May it please the court. Katherine O'Connor for Plaintiff Dr. Vasquez. The district court erred in going against this court's instruction in Richards v. Mitchiff that neither Twombly nor Iqbal has changed the general rule that district courts should not make findings of fact at the pleading stage. A complaint that invokes a recognized legal theory, as this one does, and contains plausible allegations on the material issues, as this one does, cannot be dismissed under Rule 12. In its complaint, Dr. Vasquez alleges that IU Health is a monopolist with 92.5% market share of inpatient services in Bloomington and over 97% of the primary care physicians in Bloomington. Dr. Vasquez also alleges that IU Health harnessed that market power against its competition to exclude competition through anti-competitive conduct. As a result, prices have increased, quality has decreased, and the quantity of services has decreased because patients in Bloomington can't even receive certain services. So is the essence of your complaint IU Health's decision to remove Dr. Vasquez from their network so that he was no longer one of the people who would receive referrals, or is it something broader than that? It's broader than that, Your Honor. IU Health is a monopolist in Bloomington and has harnessed that monopoly power to exclude competition in general. The anti-competitive conduct goes beyond the conduct against Dr. Vasquez, but as to Dr. Vasquez, the anti-competitive conduct also harmed him in April 2019. I mean, but surely there would be standing issues for him to complain about or harm to others? Perhaps, Your Honor, yes. So the impact on Dr. Vasquez is, as he alleges, he gets removed from the referral list because IU Health is trying to consolidate its power. It only wants to use its own, in a sense, in-house people or people with whom it has a contractual relationship. And I take it that your allegation is that he's not getting the referrals because they weren't earning as much money from his work as they would have if it had all been in-house. Is that right? It's broader than that, Your Honor. There is a concerted effort to exclude all competition, not for the benefit, not for pro-competitive reasons, which we recognize hospitals can do. We're not going to challenge that legal precedent. It's specifically to harm competition to the benefit of IU Health only to harm competition in general. So there's a statute of limitations issue in this case, the question being whether the harm is suffered when IU Health takes over the other organization or when it's Dr. Vasquez finds out that he's not going to be in the network anymore. Well, I'll turn to Richards again, Your Honor, where this court said, we have held many times that complaints need not anticipate defenses. Rule 12b-6 is not designed for motions related to the statute of limitations. All that Dr. Vasquez needed to do to survive a motion to He suffered an injury within the limitations period. He's easily done so. The complaint is clear in paragraph six and other paragraphs that he did not suffer an injury until April 2019. I understood your theory, Ms. O'Connor, to be in essence that Dr. Vasquez has his own competitive harm to allege that he experienced starting in 2019, but that your case against IU Health is going to show broader arms to competition. That's exactly right, Your Honor. Both primary care, hospital care, various specialties, right? That's exactly right. Could I ask you about the geographic market that was the principal focus of the district court's decision? Do you think the geographic market is the same for primary care and for vascular surgery? Your Honor, right now, based on the information that we used and the facts we used to plead a plausible complaint, we do. However, we recognize that economic analysis at a later stage might develop alternative markets, which is exactly what happened in Advocate. And frankly, I was reading the complaint about geographic and the discussion about geographic markets as, in essence, plausible placeholders because you're going to have to—if you were to get an expert to opine definitively at this point, I would think that would be subject to a pretty serious attack as premature without having sufficient data. Yes, Your Honor. So, yes, in part. It is a fact-intensive inquiry which necessarily requires testimony from market participants and data from the defendant as well as payers and other facilities in the area, necessarily. However, it is plausible—the markets are plausible because the facts alleged that primary care services and vascular care services are local are facts that we believe will be well established by the factual testimony. Are there any other—go ahead. No, no, go ahead. I just—are there other vascular surgeons—I'm thinking of, in essence, a rough polygon with Bloomington in the middle. You've got this ring of larger cities a good distance away—Indianapolis, Louisville, Evansville, Terre Haute—Terre Haute's not larger, but—within that area, are there other vascular surgeons besides those in Bloomington? There are other vascular surgeons, for sure, in Indianapolis, Your Honor. No, not in Indianapolis, but I mean in the markets that you are aiming at. In particular, if you live in Washington or Davies County, you're probably not going to find a vascular surgeon. No, Your Honor, there are not. Nor is there a comparable hospital in that area. No, no, there is not. On this question of geographic markets, did you use any particular test to arrive at the market you generally pled in your complaint? And a corollary to my question is, at what point must you choose a test to determine a geographic market? The answer is yes. So the hypothetical monopolist test is, in general, the test, but the question that it asks is whether a health insurance plan can offer a commercially viable product. Excluding all of the providers in the area. So it's the hypothetical monopolist test, but that is the relevant question that is asked. Go ahead. So as to the general allegations regarding why this is an antitrust case, and I take it, Your Honor, that your questions are, at the beginning, were aimed at the fact that there are other cases that say the denial of privileges to one doctor is not an antitrust case, but that's not this case, and the defendants don't make that argument. Defendants moved to dismiss on two grounds that are extremely fact-intensive questions. Market definition, which we discussed, is typically decided after expert analysis. All that Dr. Vasquez had to do at this stage was to plead a market that is identifiable and is not so absurdly small as to defy logic. Right. So back on the antitrust theory, you can look at this as an exclusionary act case where IU Health is in something of a vertical relationship with the various, whatever they may be, vascular surgeons, orthopedic people, primary care folks, whatever they may be, but there's also a horizontal dimension in that there are specialists of all of those kinds with whom Dr. Vasquez is competing, right? That's correct, Your Honor. We allege that Dr. Vasquez horizontally competes with IU Health, both at the facility level and the physician level. Mm-hmm, mm-hmm. But you're also implying that it is, as a practical matter, impossible for somebody to compete in this way in this market without access to facilities and physicians that are affiliated with IU Health, it seems. It's almost an essential facility-type argument. I mean, if IU Health— I wouldn't characterize it, Your Honor, as an essential facility argument. I would characterize it as a monopolist problem, but that's— They're closely related, I will say. Some people don't think there's a difference. The monopoly in primary care services is what allows the monopolist to exercise power over everyone else. Right, so it's kind of a leveraging point. It may well be that, just given geography and population, Bloomington is a natural market for a monopoly at the hospital level, but certainly not at the primary care. And the numbers you allege in your complaint, I will just say, to this Bloomington resident are astonishing. Your Honor, I agree that there are also cases that say some areas like this, where there's a mid-sized city surrounded by rural areas— Mm-hmm. Judge Hamilton is quite aware— Possibility for a hospital monopoly, but that doesn't mean the monopolist can use that power to exclude competition and harm competition through increased prices and reduced quality and reduced quantity. So what do you make of your opponent's argument that your market is inherently flawed or contradictory because it's clear that people are driving an hour or two to get services, and if they can easily enough do that, then haven't you alleged something that's so porous, we need to go out further than either of the two markets you postulate? Yeah. So that point, Your Honor, that patients from rural areas need to go to Bloomington because Bloomington Hospital is a must-have hospital, is excised from one sentence among 13 paragraphs on harm to competition. Let's see what it actually says, which is many of the patients who arrive at Bloomington Hospital for care travel from rural areas, some of them up to two hours away. That's talking about patients being transferred from critical access facilities to Bloomington Hospital, and that's why there's a plausible geographic region also of the 10-county area. But the next sentence says it causes unneeded strain on those patients to travel an additional hour to Indianapolis to receive proper care. So increased travel times lead to increased morbidity for patients. So it's not contradictory that Bloomington patients want to stay there, and rural patients who need increased acuity need to go there too. That is not inherently contradictory. I believe I would like to reserve my time, but I will... Okay, thank you, Your Honor. No problem. Mr. Grubbe. Good morning, Your Honors. May it please the Court. I guess I'd like to pick up some of Ms. O'Connor's statements and respond to some of your questions because, frankly, I thought you were making my case in some respect. At least the points I wanted to make going forward. That's extraordinary. Let's just be clear that we try to explore all facets of all sides. I understood, Your Honor. I thought I would get the other side of the coin when I stood up to answer your questions. To start where you began, Judge Hamilton, are primary care services and vascular surgical services in the same market? Probably not. This Court has recognized that those kinds of differences between specialty services and primary care services often do differently to different sized markets. That's not in the record at this point, as Ms. O'Connor said, but it is something that we're looking toward. And it also bears on the key point that really launches into our argument that the Court below did not make any mistakes in reading the plaintiff's complaint to mean what it says. But let's just say... No one thinks that if you need vascular surgery, you're going to go to a primary care physician. And the primary care physicians are not holding themselves out to be specialists in vascular surgery. But what I understand the complaint to be saying is that there's an economic link between the two and that the primary care physicians are the gatekeepers for, again, I don't care whether it's a neurologist or a vascular surgeon or somebody else, you don't get to them. And if IU has the power that it has over the primary care people, they will never refer to an outside network, if you will, vascular surgeon. That is the plaintiff's leveraging theory, I agree. But nonetheless... So who goes to a vascular surgeon without a PCP referral? It's not in the complaint, Your Honor, but it would be... No one. I mean, I don't think... Well, I would say that there are referrals from cardiologists. I would say there are referrals from nephrologists. I would say... And to see cardiologists and nephrologists, you go through a primary care physician, usually, right? Potentially, sure. Could I ask you, if we could, about the statute of limitations issue. Could you point me to the allegation in the complaint that you're relying on to contend that Dr. Vazquez alleges he was injured and knew he was injured at the time of the premier acquisition? We're relying principally on paragraph 62, Your Honor, which is where the plaintiff alleges that IU Health commenced its targeted systematic scheme toward Dr. Vazquez based on his maintenance of his independence. And that's... And how do you get his recognition of that out of paragraph 62? It's an inference we're drawing, Your Honor, from the following paragraphs. Okay. He obviously recognized it now. I don't see how your view and the district judge's view comports with this complaint on the issue of the statute of limitations. If he had filed suit in June of 2017, what would he have said? Right after the acquisition, he's still in the network. He still has privileges at Bloomington Hospital. He hasn't seen what he later recognizes, he alleges, is the systematic campaign. He would have said that at that point, he knew that there were a number of specialists in the healthcare outfit that was acquired, the physicians group, and that some of them, one of them was a vascular surgeon. And they also acquired several, although not many, primary care physicians who became part of Indiana Health's physician group. This is the basis for his claim of power. He might have been able to say there they have monopoly power. He hasn't been heard at that point, has he? Not by the termination of his privileges. I'm going back to 2017, right? Correct. So how would he say he's been hurt in June of 2017, a month after the acquisition? It has to come from the allegations right after paragraph 62, 63, 64, where he's talking about the coordinated campaign by the hospital staff. And he's referring to events in 2018, 2019. I mean, I just don't see it. And you're very strong in your brief in saying the complaint makes this clear. And I'm asking you where it makes that clear. If 62 is your best answer, I'll take that as your best answer. 62 is our best answer, Your Honor. Okay. But let me pivot from there. That still doesn't answer the question whether or not the injury that Dr. Vasquez is complaining about in April of 2019 can relate back to the acquisition. It's the difference between acquiring a monopoly and monopolizing. And the Supreme Court has made it very clear that simply the status of having a monopoly is not what Section 2 is aimed at. The term is monopolize. And perhaps if IU Health had continued to have an open network policy, he was in the policy, maybe he never would have been injured. But he's thrown out of the network. And we have to assume, taking the facts in the light most favorable to him at this stage, that the reason was an anti-competitive reason. We can't assume. I mean, I know you have like threaded through your brief. There may have been other reasons too. That's for way down the road, you know, minimum summary judgment. Speaking of the part of the road that we're on, can you point to any circuit precedent where a complaint has been dismissed for failure to state a claim in a, regarding a geographic market in this hospital services context? Within the circuit, I would point to the Cogart case. At the motion to dismiss stage. Are you referring to the district court decisions that precede advocate? Yes, I am, Your Honor. And Cogart was a summary judgment decision. But Arnett was a motion to dismiss decision. And it precedes advocate. Correct. And do any, I think the question if I understood it was about circuit court decisions. I do not have any circuit court decisions of this court dismissing a claim on relevant geographic market grounds in the hospital context. Any others? Not in the healthcare context, no. No. The intercollegiate soccer and horse racing, right? Yeah, but that's, you bring up the Concord Associates case from the Second Circuit, Your Honor, from 2014. And that's an important case to look at here. Because what the court rejected was precisely one of the arguments the plaintiff is pushing forward that they have asserted enough facts to support their relevant geographic market allegation when they haven't. Instead here, what the plaintiff is relying on is her designation or his designation of the healthcare market in and around Bloomington as, quote unquote, local. But they don't provide any content to that label. And the Concord Associates case says that without that content, you can't rely on a label like local to support a relevant geographic market. There's a lot more than a label here. Do you think an insurer could sell a group policy to an employer in Bloomington without including access to Bloomington Hospital? Perhaps, perhaps not. But I think what the... How would you do that without having access to IU Hospital? You're an insurer. You're selling people something. And you say, well, by our policy, you know, employers of the Bloomington area, by our policy, but you're going to have to send everybody up to Indianapolis if they need hospital care. For someone, for some particular purchaser of insurance in Bloomington, I'm certain they wouldn't be pleased with a plan that didn't allow them to seek services in Bloomington. However, going back to Judge Hamilton... Which is a big deal under the advocate case. That's a major point. I agree with that completely. The problem for Dr. Vasquez is that the insurer's decisions on whether they can sell a marketable plan is whether the patients are going to buy it. Not patients. Whether you can sell the plan to the employers, the actual purchasers of these plans, because we've recognized that that's the way this market works. True. But the insurers and the employers are all proxies for the patients or the employees. And the acceptability or appeal of any particular plan is going to be based on how far they are willing to travel. And here, how far the plaintiff alleges they can and do travel. These things are proxies. You and the district judge have seized on the two hours, in essence, that some folks may travel from Orange County to Bloomington, right? Well, what we've seized on is that in part. In paragraph 92, as Ms. O'Connor said, was that most patients travel, some up to two hours. That's part one. But why are we... Can I just say, I found it a little weird to tell you the truth. You know, when you're looking at patients who show up at Bloomington Hospital for care, who've come from rural areas, what are they supposed to do? Just stay home and not get hospital care? Of course, they travel further from rural areas and somebody who lives right in the middle of Bloomington would. But the question is, if you add on another area, another hour, I'm looking at the line in paragraph 92, it causes unneeded strain in those patients to travel an additional hour to Indianapolis to receive proper care. That additional hour could have tremendous health consequences. Correct. That's why we also look to paragraph 38. Both we and the court looked at the counties that are within the proposed Southern Indiana market. Those counties, as the district court found, are as close or closer to other cities where care presumably could be obtained. But all geographic markets get fuzzy at the edges. Yeah, you can always quibble at the edges, right? But not all of those counties are at the edges. They penetrate further into the territory. And what we're talking about is the market that- Should we be looking at data for Lawrence County, for, oh, maybe Brown or those counties? Well, yes. But at this stage- How do we do that on the pleadings? We look to Google Maps. Of which we can take judicial notice. No, no, no, no, no. I mean, there's much more than that. Isn't the fact that we're talking about so much data problematic? I mean, you have acknowledged that plaintiffs don't need to retain an expert, an economist, sorry, to draft complaints. But without an economist or other expert, by your logic, what else should Dr. Vasquez, what else should he have pled? I would start by looking at where his patients actually come from. He's still a competing physician in the area. He's practicing at three different locations, both his own clinic at Monroe Hospital and at the Special Surgery Center. And it's well within his reach to understand what procedures he's performing, where those patients are coming from. And that information, though not perhaps enough to support an expert opinion, certainly would provide real factual material as Twombly requires to inform the concepts and the market definition that he's alleging. It can't just be that you can allege a market is local and insurers have to have a physician in a particular city to be able to state a claim. That's no different than saying a conspiracy is a conspiracy. But he's alleged so much more than that. Can I ask you about, in terms of geographic markets, can I ask you about IU Health's non-competes with its primary care physicians? Is it correct that those use an 11-county area for at least for those who are practicing in Bloomington? As a matter of fact, Your Honor, I do not know. But what I do understand Dr. Vazquez to be saying is that the scope of the non-competes is coincidental with the scope of Bloomington Hospital. It's close. It's not, yeah, yeah. And why isn't that a pretty good signal about a market area? It's a signal for where IU Health provides services or at least where Bloomington Hospital provides services. It's a signal of the places to which people would turn in order to get primary health care because they're concerned that if you violate the non-compete, you'll be taking business away from IU. Yes, but it also doesn't mean that patients can't or even do travel to different locations. But that's where the speculation comes in. I think Dr. Vazquez's complaint points to evidence that goes in the other direction. I mean, you're just kind of guessing people might go somewhere else. What do you think is the relevant primary care geographic market that includes Bloomington? I don't have the first. Not a clue. No. Okay. No, I presume based on intuition, based on the Marshfield Clinic decision that it's probably smaller than vascular services. But what his precise definition is, I cannot tell you standing here today. But even in the larger 10 county area, plaintiff is alleging you all have greater than an 80% share of the primary care market, right? That is what he alleges. Let me ask you about the amendment. You spent a large part of your brief arguing that amendment would have been futile. When the district court preemptively decided not to allow Dr. Vazquez to amend, the district court did not rely on that. The district court said, he missed his chance by deciding to litigate the motion to dismiss. So why should we rely on your reasoning? That wasn't the district court's reasoning. I think what the court can do and what the court has done in the past is observe what the allegations are in the complaint and what offer has been made by the plaintiff to amend the complaint and make a determination then whether those amendments would be sufficient to cure the deficiencies in the complaint. Here, certainly, Dr. Vazquez didn't ask or take advantage of any of the opportunities that were available to him to try to amend. And now on appeal, he has identified some additional facts, quote unquote, that he would add to his complaint to enhance its factual content. For the reasons we stated in the brief, we don't believe those sufficient to overcome the dismissal. Did you have any follow-up? No. All right, thank you very much, Mr. Grube. Anything further, Ms. O'Connor? Your Honor, just one, about 20 seconds, hopefully. I just wanted to sort of harness something that Mr. Grube said, which is, to allege a geographic market, Dr. Vazquez must look at his own patients. Well, that's precisely what he did.    was looking at his own patients. There was a basis for the facts alleged in the complaint. As Rule 11 would require you to have. Absolutely, Your Honor, absolutely. I don't have anything further, unless the court has further questions. I see none, so thank you very much. Thank you as well, Mr. Grube. The court will take the case under advisement.